1    QUINN EMANUEL URQUHART & SULLIVAN, LLP
2       Karin Kramer (Bar No. 87346)
        karinkramer@quinnemanuel.com
        Arthur Roberts (Bar No. 275272)
3       arthurroberts@quinnemanuel.com
        Patrick Burns (Bar No. 300219)
4       patrickburns@quinnemanuel.com
     50 California Street, 22nd Floor
5    San Francisco, California  94111-4788
     Telephone:     (415) 875-6600
6    Facsimile:     (415) 875-6700

7       Thomas C. Rubin (*Pro Hac Vice*)
        tomrubin@quinnemanuel.com
8    600 University Street, Suite 2800
     Seattle, Washington 98101
9    Telephone:     (206) 905-7000
     Facsimile:     (206) 905-7100
10   *Attorneys for Rhapsody International Inc.*

11

12                    **UNITED STATES DISTRICT COURT**
              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                            **OAKLAND DIVISION**
13

|  |  |
|---|---|
| DAVID LOWERY, VICTOR KRUMMENACHER, GREG LISHER, and DAVID FARAGHER, individually and on behalf of themselves and all others similarly situated, | Case No.  4:16-CV-01135-JSW |
|  | **DEFENDANT RHAPSODY INTERNATIONAL INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO RULE 12((b)(1) FOR LACK OF ARTICLE III STANDING** |
| Plaintiffs, |  |
| v. | The Hon. Jeffrey S. White |
| RHAPSODY INTERNATIONAL, INC., |  |
| Defendant. | Date:         April 14, 2017<br>Time:         9:00 AM<br>Courtroom:  5 |
|  | Complaint Filed:  March 7, 2016 |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that on April 14, 2017 at 9:00 AM, the undersigned will appear before the Honorable Jeffrey S. White in Courtroom 5 of the United States District Court for the Northern District of California, Oakland Division, 1301 Clay Street, Oakland, CA 94612, and shall then and there present Defendant Rhapsody International Inc.'s Motion to Dismiss Pursuant to Rule 12(b)(1) for Lack of Article III Standing.  This motion is based on this Notice of Motion and Motion, as well as all records and papers on file in this action, any oral argument, and any other evidence that the Court may consider in hearing this Motion.

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................................ iii

STATEMENT OF ISSUES .......................................................................................................... v

SUMMARY OF ARGUMENT (Civil Standing Order ¶ 7) ...................................................... vi

STATEMENT OF FACTS ............................................................................................................ 1

LEGAL STANDARD ................................................................................................................. 11

ARGUMENT ............................................................................................................................... 11

I.       Self-Inflicted Harm Cannot Establish Article III Standing ................................... 11

II.      Plaintiffs' Prior Statements and Actions Demonstrate Their Harm Is Self-Inflicted ........... 14

CONCLUSION ........................................................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

*Ass'n of Am. Med. Colleges v. United States*,
  217 F.3d 770 (9th Cir. 2000) ................................................................................1

*Cetacean Cmty. v. Bush*,
  386 F.3d 1169, 1174 (9th Cir. 2004) ...................................................................11

*City of Oakland v. Lynch*,
  798 F.3d 1159 (9th Cir. 2015) .............................................................................11

*Clapper v. Amnesty Int'l USA*,
  133 S. Ct. 1138 (2013) .........................................................................................12

*FW/PBS, Inc. v. Dallas*,
  493 U.S. 215 (1990) .............................................................................................11

*Ferrick v. Spotify USA Inc.*,
  No. 16-cv-8412 (S.D.N.Y. 2015) ..........................................................................8

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) .............................................................................................12

*In re Google, Inc. Privacy Policy Litig.*,
  No. 5:12-cv-1382, 2015 WL 4317479 (N.D. Cal. July 15, 2015) ........................12

*McConnell v. Federal Election Com'n*,
  540 U.S. 93 (2003) .........................................................................................13, 15

*Mendia v. Garcia*,
  768 F.3d 1009 (9th Cir. 2014) .......................................................................12, 13

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*,
  468 F.3d 826 (D.C. Cir. 2006) ......................................................... vii, 12, 13, 14, 15

*Red v. Gen. Mills, Inc.*,
  No. 2:15-CV-02232ODWJPR, 2015 WL 9484398 (C.D. Cal. Dec. 29, 2015) ........... vii, 13, 15

*St. Clair v. City of Chico*,
  880 F.2d 199 (9th Cir. 1989) ...............................................................................11

*Swann v. Secretary, State of Georgia*,
  668 F.3d 1285 (11th Cir. 2012) ......................................................................13, 15

## <u>Statutes</u>

17 U.S.C. § 102(a) ...................................................................................................1

17 U.S.C. § 115 ..............................................................................................1, 2, 3, 7

17 U.S.C. § 115(a)................................................................................................1

17 U.S.C. § 115(b)(1).........................................................................................1, 2

17 U.S.C. § 115(c)(1)............................................................................................3

17 U.S.C. § 115(c)(3)............................................................................................1

## **Rules**

Fed. R. Civ. P. 12(b)(1).....................................................................................1, 11

Fed. R. Civ. P. 12(b)(6).........................................................................................1

1

## **<u>STATEMENT OF ISSUES</u>**

2      1.      Do Plaintiffs have standing to assert their claims if their alleged injuries are self-

3  inflicted?

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## SUMMARY OF ARGUMENT (Civil Standing Order ¶ 7)

2       The cardinal requirement of federal jurisdiction is Article III standing.  Standing requires

3   an injury-in-fact, fairly traceable to the defendant.  A plaintiff who manufactures standing through

4   self-inflicted harm cannot meet that requirement and is not entitled to maintain a lawsuit in

5   Federal Court.

6       Self-inflicted harm is what occurred here.  Plaintiffs are well versed in the intricacies of

7   copyright law and have a long history of taking the standard and necessary steps to obtain their

8   royalties.  To bring their lawsuit, they deliberately engaged in activities designed to make sure

9   they would not receive their royalties on a timely basis, so they could claim to be "left

10   emptyhanded," Compl. ¶ 27, and thus able to allege an injury to show standing.  Because their

11   voluntary acts are sufficiently independent causes of their alleged injury, under the law they do not

12   have Article III standing.  *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468

13   F.3d 826, 831 (D.C. Cir. 2006) ("[S]elf-inflicted harm . . . does not amount to an 'injury'

14   cognizable under Article III."); *Red v. Gen. Mills, Inc.*, No. 2:15-CV-02232ODWJPR, 2015 WL

15   9484398, at *4-5 (C.D. Cal. Dec. 29, 2015) ("[S]elf-inflicted injury . . . does not confer

16   standing.").  Defendant Rhapsody International Inc. therefore respectfully moves to dismiss this

17   case.

18

19

20

21

22

23

24

25

26

27

28

1

## STATEMENT OF FACTS[1]

2

**Defendant Rhapsody International Inc.**

3  Rhapsody is a digital music service.  Subscribers to Rhapsody can stream or download the

4  music of their choice to computers and handheld devices: mobile phones, tablets, etc.  Compl.

5  ¶ 17.  Like other music services such as Spotify, Apple Music, Google Play, and Amazon Prime,

6  Rhapsody not only offers popular tracks from well-known performing artists signed with major

7  record labels, but also offers tracks from new, independent, and lesser-known songwriters and

8  musicians, which gives these artists access to a ready-made audience of millions of music fans.

9  Declaration of Pauline Martin ("Martin Decl.") ¶ 2.  And whereas the complaint alleges that

10  Rhapsody earns "millions of dollars in revenue," Compl. ¶ 21, in fact Rhapsody pays out a large

11  proportion of its revenue in royalties to rightsholders, including record labels, music publishers,

12  distributors, and performing rights organizations who in turn pay artists and songwriters.  Martin

13  Decl. ¶ 3.  Plaintiff David Lowery has referred to Rhapsody as a "white hat" "which has

14  consistently paid artists."  Roberts Decl., Ex. 6 at 22.

15

**Section 115 and Rhapsody's efforts to secure mechanical licenses**

16  The music Rhapsody offers is covered by four copyright licenses: (1) public performance

17  of sound recordings; (2) reproduction of sound recordings, (3) public performance of musical

18  compositions, and (4) reproduction of musical compositions (the "mechanical license").  17

19  U.S.C. § 102(a).  This dispute involves mechanical licenses.  Section 115 of the Copyright Act

20  subjects copyrights in musical compositions to a compulsory mechanical license; a proceeding

21  overseen by the Copyright Royalty Board establishes the statutory royalty rate.  *Id.* § 115(a), (c)(3)

22  Section 115 was enacted in 1976, in a different era of music distribution: an industry

23  geared towards manufacture and distribution of physical vinyl records.  Section (b)(1) provides

24  that in order to avail oneself of the compulsory license, a user must serve a notice of intention

25

26  [1]  Where possible, Rhapsody has relied on allegations in the Complaint.  However, a Rule 12(b)(1) motion based on a factual challenge may bring in facts outside of the complaint.  *Ass'n of*

27  *Am. Med. Colleges v. United States,* 217 F.3d 770, 778 (9th Cir. 2000) ("For motions to dismiss under Rule 12(b)(1), unlike a motion under Rule 12(b)(6), the moving party may submit affidavits

28  or any other evidence properly before the court.") (internal quotation marks omitted).

("NOI") to use the work within 30 days after making use of the work and before distribution.  If Copyright Office records identify and contain contact information (including address) of the copyright owner, an NOI must be served on him or her.  *Id.*  Otherwise, it may be filed directly with the Copyright Office.  *Id.*  This timing was workable when music was served up on vinyl at a much slower rate than today.  A record label could generally file an NOI for the 10 to 15 songs the label itself selected to appear on an album within 30 days after pressing the record and before shipping it to stores.  Today, however, music is churned out at a furious rate, and applying the compulsory license to digital distribution services is on a completely different scale than it was for 1970s-era record labels.  Rhapsody, for example, receives tens of thousands of new songs *each week* from record labels and distributors.  Martin Decl. ¶ 4.  These parties provide it to digital services so the public can hear it.  *See id.*  Digital services are the outlet for artists' work.

This outdated statute is the root of the problem facing Rhapsody and every other music service.  It is near impossible for a streaming service like Rhapsody to comply with the statute in respect of each and every track available on the service without crippling its business—a result which would not serve the interests of artists, songwriters, or other stakeholders in the industry.  Nor would it serve the public who wants to hear that music.  Mr. Lowery himself is acutely aware that the problem is caused by the outdated statute and licensing regime: "**The NOI system for licensing streaming mechanicals in the United States is essentially broken**. If we want to have streaming services that have more than a few million tracks on them, we can't have that system." Roberts Decl., Ex. 7 at 2 (emphasis in original).

In today's digital market, streaming services typically receive sound recording files just hours or days before the release date of the recording, when it is expected and required to be available on the service.  Martin Decl. ¶ 4.  Even if it were feasible to send NOIs before distribution of each work, it is not always known where to send them—Copyright Office records that might be used to identify rightsholders are hopelessly incomplete, often inaccessible, and frequently out of date.  Roberts Decl., Ex. 8 at 3-4; Ex. 9 at 13-15; Ex. 10 at 12-13.  Importantly, even strict compliance with Section 115 would still not result in payment of royalties to *unknown* rightsholders, because they would remain unknown.  The statutory scheme is incompatible with

1   the practical reality of providing music in the digital format the public prefers today—music

2   available immediately that can go with a person anywhere, anytime—and with the desire of artists

3   and songwriters to build online audiences.

4           The Copyright Office itself has acknowledged the severity of the problems with the

5   operation of the compulsory license scheme, and it has been working on fixes.  Roberts Decl., Ex.

6   10 at 12-17.  But until adequate reforms are enacted (which will likely require a new statute from

7   Congress), the system is simply unworkable.  Because of that, the industry developed a process

8   that provides a practical solution to the problem that enables the services to offer the music

9   immediately and issue licenses and NOIs when the rightsholders are identified, and that provides

10  royalties to rightsholders irrespective of whether they are identified in the registration or other

11  public records of the United States Copyright Office.[2]  Martin Decl. ¶ 5

12          **The Harry Fox Agency and its relationship with Rhapsody**

13          The Harry Fox Agency ("HFA") is the leading administrator of mechanical rights in the

14  world.  *See* Roberts Decl., Ex. 11 at 13.  It is also the leading administrator of  mechanical licenses

15  and royalties for a vast number of United States publishers—that is, the copyright holders of the

16  musical compositions or their representatives—on behalf of music services like Rhapsody.

17  Declaration of John Raso ("Raso Decl.) ¶ 2.  If the publisher of a song is affiliated with HFA,

18  HFA can either issue a direct license if one has been negotiated, or obtain a compulsory license

19  under Section 115 on Rhapsody's behalf.  *Id.* ¶¶ 3-5.  Even if a rightsholder does not operate

20  through an HFA-affiliated publisher, it still may provide ownership information directly into

21  HFA's industry-leading database by filling out an online form.  *Id.* ¶ 6.  The simple process of

22  inputting this ownership information—thereby facilitating the match of song to rightsholder for

23  the payment of royalties—is available to any copyright owner and is *free*.  Raso Decl. ¶ 6; Roberts

24  Decl., Ex. 11 at 14; Roberts Decl., Ex. 12.

25

26          [2]  Under Section 115(c)(1) of the Copyright Act, owners of mechanical rights are not entitled
    to royalties under a compulsory license unless they are identified in the registration or other public

27  records of the Copyright Office.  Nonetheless, Rhapsody and other music services have chosen to

28  pay royalties regardless of whether copyright owners are so identified.  Martin Decl. ¶ 5.

1    **Plaintiffs and their copyright expertise**

2    Plaintiffs have significant music copyright expertise.  The complaint alleges that Mr.

3    Lowery "has been a fixture of the music industry for decades," and is a "prolific songwriter and

4    producer," and a member of what he refers to as "his popular groups Cracker and Camper Van

5    Beethoven." Compl. ¶ 7.  Mr. Lowery is also on the faculty of the Terry School of Music at the

6    University of Georgia, where he teaches courses about "publishing, copyright, and the music

7    industry at large."  Roberts Decl., Ex. 13 at 7.  The writer of the article containing these facts

8    interviewed Mr. Lowery after he had "just lectured two dozen undergraduates about the

9    complexities of publishing royalties in the digital music industry."  Roberts Decl., Ex. 13 at 3.  Mr.

10   Lowery has testified before Congress, made submissions to the U.S. Copyright Office, writes a

11   blog ("The Trichordist"), publishes articles, and speaks at conferences, all on music copyright

12   issues.  Roberts Decl., Ex. 14, at 1-2.  Mr. Lowery chose his textbook, Music Publishing: The

13   Complete Guide by Steve Winogradsky, because "it's one of the few academic texts that actually

14   explores publishing in a modern digital music industry."  Roberts Decl., Ex. 13 at 13.

15   Mr. Lowery's chosen textbook contains a 30-page section on mechanical licensing.

16   Roberts Decl., Ex. 11.  A mechanical license, as mentioned above, governs the reproduction and

17   distribution of the musical composition in a track.  *See* Roberts Decl., Ex. 11 at 4.  The textbook

18   explains that, among the licenses that may be necessary to use a piece of music, mechanical

19   licenses are unique in that the consent of the copyright holder is not required:  "Of the types of

20   licenses discussed in this book, the mechanical license is the only one where the Copyright Act

21   specifically sets out a method whereby a party may obtain a valid license without the consent of

22   the copyright owner, subject to certain procedures being followed, and a statutory rate of

23   payment."  Roberts Decl., Ex. 11 at 4.

24   The textbook used by Mr. Lowery also demonstrates the ease with which an artist can

25   provide identifying information in order to be compensated through HFA.  The textbook states:

26   A publisher must join HFA as a publisher affiliate which can be done for ***no fee***.
     This allows the publisher to register their songs with HFA . . . so that a potential
27   licensee can find them on the HFA website and obtain a license electronically. . . .
     Once the licensee has established an account, it can research the HFA database to

28

---

4                                              Case No. 4:16-CV-01135-JSW

1    locate the correct songs, titles, writers, and publishers, and request that a license be
2    issued for a particular project.

3    Roberts Decl., Ex. 11 at 14 (emphasis added).  The textbook even includes a sample letter for a

4    rightsholder to send to HFA identifying information of the owner of the mechanical rights in a

5    song, so that the song can be licensed and the royalties paid.  Roberts Decl., Ex. 11 at 33.

6        The other three plaintiffs also have extensive music industry experience.  Unlike many

7    class actions where plaintiffs are a disparate and unrelated group of individuals who independently

8    bought a product or suffered a harm, Plaintiffs Lowery, Krummenacher, Lisher, and Faragher go

9    back decades as co-band members, songwriters, and performers.  Compl. ¶¶ 8-10.  Lowery,

10   Krummenacher, and Lisher have collaborated as members of Camper Van Beethoven since the

11   1980s, and Cracker, which was formed in 1990, has included Lowery, Faragher, and

12   Krummenacher.  Roberts Decl., Ex. 15 at 1-2; Ex. 16 at 1-2.  As alleged in the Complaint, the

13   others Plaintiffs also have rights in several of the copyrights at issue in this case.  Compl., Ex. E.

14       As much as anyone, and more than most, Mr. Lowery and his fellow named Plaintiffs

15   understand the "complexities of publishing royalties in the digital music industry."  Roberts Decl.,

16   Ex. 13 at 3.  They know, based on their long history of speaking on these issues, teaching, working

17   in the industry, and collecting mechanical royalties, that receiving payment for these royalties

18   requires a minimal amount of their cooperation.  The key to the system working is for them to take

19   the incredibly simple, non-onerous, and totally free step of providing their name and address to

20   HFA when (or even after) their songs are submitted to music services so HFA can enter the

21   information into their database.  The database is the vehicle by which songs are matched to

22   copyright holders for the purpose of paying royalties.  The only reason why these Plaintiffs would

23   be "left emptyhanded," Compl. ¶ 27, is because they failed to take that simple step.

24       **Plaintiffs' deliberate use of a phantom publisher**

25       It is indisputable that Plaintiffs are aware of the minimal action on their part necessary to

26   ensure they receive mechanical royalties because they have done it in the past.  For many years,

27   Plaintiffs frequently affiliated with publishers who had agreements with HFA that allowed

28   Rhapsody to identify Plaintiffs and pay them royalties.  Martin Decl. ¶ 8.  Plaintiffs used a well-

known publisher and affiliate of HFA for several of the tracks on the following albums:  *Our Beloved Revolutionary Sweetheart* (Camper van Beethoven, 1988), *Cracker* (Cracker, 1992), *Kerosene Hat* (Cracker, 1993), *Camper Vantiquities* (Camper van Beethoven, 1993), *The Golden Age* (Cracker, 1996), *Garage d'Or* (Cracker, 2000), and *Popular Songs of Great Enduring Strength and Beauty* (Camper van Beethoven, 2008).  Rhapsody has licenses for those HFA-affiliated publishers' repertoire and paid Plaintiffs royalties via HFA pursuant to agreements covering these albums.  Martin Decl. ¶ 8.

But for the songs cited in Plaintiffs' Complaint, which are from the two albums Plaintiffs' bands released in 2014, *El Camino Real* (Camper Van Beethoven) and *Berkeley to Bakersfield* (Cracker), none were published or administered by HFA-affiliated publishers, nor did they register the songs with HFA.  Raso Decl. ¶ 8.  Plaintiffs instead purportedly administered their rights for these albums through Bicycle Spaniard Music and Camper Van Beethoven Music Co.  Roberts Decl., Ex. 17 at 2-7.  Unlike the publishers Plaintiffs had utilized for many years, Bicycle Spaniard Music and Camper Van Beethoven Music Co. did not affiliate with HFA, partner with an affiliate of HFA, or register their songs with HFA through HFA's free and publicly available process.  Raso Decl. ¶ 8.  Nor could Bicycle Spaniard Music or Camper Van Beethoven Music Co. be readily identified, for they are largely hidden:  neither entity has a website, nor any internet presence whatsoever, and are apparently not corporations.  Roberts Decl. ¶ 2.

Over the past few months, Rhapsody attempted to seek discovery from these entities, and counsel for Plaintiffs accepted service of subpoenas for them on December 22, 2016.  Roberts Decl., Exs. 18, 19.  In responses to the subpoenas, Rhapsody learned that—contrary to how those entities hold themselves out—they are not in fact companies but are merely "DBA[s] of Plaintiffs."  Roberts Decl., Exs. 20, 21.  In other words, they are not even publishing companies at all, reinforcing that these "publishers" cannot be found using corporate record searches or otherwise.  Had Plaintiffs used or partnered with established publishers as they had in the past, or had the Plaintiffs input ownership information into HFA's database, HFA would have been able to properly identify them and make the match necessary to pay royalties on time.  Raso Decl. ¶ 9.

**Plaintiffs' failure to avail themselves of a remedy for their purported harm**

Prior to the filing of this lawsuit, HFA was able to identify the ownership of the works through manual searches of song information found through a July 2015 post on Mr. Lowery's blog,[3] and in accordance with standard industry practice, issued NOIs and royalty checks on behalf of Rhapsody to pay plaintiffs the royalties they would have received earlier had the ownership rights been known previously.  Raso Decl. ¶ 10.  As is self-evident, such manual searching is not "scalable," i.e., could not possibly occur on the statutory timetable for the number of songs produced weekly, nor would HFA or anyone else know in advance what, when or whether manual searches would even turn up the information.  In any event, Plaintiffs never cashed the checks. Raso Decl. ¶ 10.  To put the matter in perspective, the mechanical royalties owing to Plaintiffs for all of the compositions listed in the complaint comes to under $70.[4]  Martin Decl. ¶ 9.

By following up on information once they became aware of it, HFA followed the exact same procedure here that they have used in hundreds of thousands of prior instances in which they have issued NOIs for Rhapsody.  Raso Decl. ¶ 5.  Other rightsholders routinely accept and cash royalty checks under these circumstances.  Raso Decl. ¶ 11; Martin Decl. ¶ 5.  This fact indicates almost universal acceptance of the industry solution developed to address—and even improve upon—the problem of the outdated statute.  There is no unwillingness by streaming music participants to pay or accept royalties merely because the requirement to file an NOI before distribution cannot be met, or because rightsholders have not met their statutory obligation to be identifiable in the records of the Copyright Office.  In other words, this is absolutely not an issue of an industry not paying royalties; it is an issue of digital music services, which receive music weekly from a proverbial firehose, not always being able to locate the right people to pay for

---

[3]  Lowery wrote a blog post on July 20, 2015 entitled "Spotify's Failure to License My Songs in US Illustrates Rethink Music's Call for Transparency," which stated that Camper Van Beethoven Music Co. and Bicycle Spaniard held rights to over 200 songs.  Roberts Decl., Ex. 17. The vast majority of those songs, which had been released long before the blog post, were not cited in the Complaint.  *Id.*; Compl. ¶ 29.

[4]  Rhapsody pays out sound recording and public performance royalties that typically total many times what the same tracks earn in mechanical royalties pursuant to Section 115.  Martin Decl. ¶ 9.

1   mechanical licenses at the exact time of release. The industry and songwriters have adapted to this

2   situation, and have developed the widely and mutually implemented solution where NOIs are

3   accepted, licenses issued and royalties paid after the release date. Martin Decl. ¶ 5.

4        After Plaintiffs failed to identify their works in the HFA database or to provide information

5   about their exclusive shadow "publishers" in 2014, they filed the first of their lawsuits alleging the

6   same claims made here, in 2015 against Spotify.[5]  Plaintiffs filed this action against Rhapsody

7   three months later, after refusing to accept NOIs and the royalties sent on behalf of Rhapsody for

8   their mechanical rights.  The inescapable conclusion from these facts is that Plaintiffs did not avail

9   themselves of many available options: (1) affiliating with a well-known publisher consistent with

10  their past practice; (2) registering their songs for free with HFA; or (3) accepting the payment

11  submitted on Rhapsody's behalf for royalties they would have been owed.  Had they chosen any

12  of these options, they would have been properly compensated, negating the harm they now allege,

13  but they declined to do so.  Why?

14         **Mr. Lowery's personal vendetta against digital music services**

15        Although Plaintiffs virtually stand alone in their refusal to be paid royalties as soon as the

16  match can be made between them and their songs, Mr. Lowery nevertheless considers himself a

17  "champion" of artists' rights—as he defines them—a crusade he waged against record labels and

18  now has taken to the digital music services.  Regardless of one's view of his mission, it is that

19  mission that led to these Plaintiffs not receiving their mechanical royalties, not any action or

20  omission on the part of Rhapsody.  Rhapsody did not refuse to pay them; Plaintiffs effectively hid

21  and then refused to accept full payment once they were found.  Raso Decl. ¶ 10.

22        Mr. Lowery has made many public statements that reveal his animus toward the online

23  music industry and support the conclusion that Plaintiffs engaged in intentional conduct to entrap

24  streaming services such as Rhapsody.  Mr. Lowery is critical of the plight of creators in the

25  internet era and has repeatedly stated that the advent of music-streaming services is even worse for

26

27        [5] *See Ferrick v. Spotify USA Inc.*, No. 16-cv-8412 (S.D.N.Y. 2015) (Lowery's action was

28  consolidated with the later-filed *Ferrick* matter).

working musicians than the record labels of old.  Roberts Decl., Ex. 6 at 26.[6]  He is especially critical of the laws that allow for compulsory mechanical licensing of musical compositions at a royalty rate set by statute, and has made it his mission to upend them.  *See generally id.*, Ex. 6.  Salon.com describes him as "one of the musicians most critical of the ways musicians are paid in the digital era."  Of relevance here, they describe him as being "frustrated with the rise of streaming services . . . ."  Roberts Decl., Ex. 22 at 2.  As Mr. Lowery himself explained it in the article:  "For us, it's the worst-case scenario. . . . The old boss [the record labels] and the new boss [the streaming services] have joined hands, they're singing 'Kumbaya,' and they've changed the words to, '[f***] the songwriters! [f***] the performers!'"  *Id.*

Mr. Lowery has continued making inflammatory statements about the online music streaming services industry after the filing of the lawsuit, which reveal that his intentions in filing this action are to disrupt the entire industry.  For example, on a podcast dated August 10, 2016, he stated in the analogous context of the compulsory licensing for the public performance of musical compositions:  "My inclination is to go oh ok you want to do that to us?  Let's just cause chaos.  Let's just have all the [song]writers have a writers strike. . . . We just won't cooperate with this. Now what are you going to do?"  Roberts Decl. ¶ 14.

### The role of Christian L. Castle and Plaintiffs' discovery conduct as it relates to this motion

Plaintiffs and his associates have blocked the ability of Rhapsody to obtain additional evidence that may support this Motion.  However, Rhapsody committed to filing its motion by this date and therefore does so based on the factual materials currently available to it.  Rhapsody may need to seek leave of Court to supplement its factual showing.

Christian L. Castle is a writer and another outspoken critic of the music streaming services industry who publishes a blog called MusicTechPolicy (musictechpolicy.com).  Roberts Decl. ¶ 3.  He happens to be a lawyer.  *Id.*  Mr. Lowery and Mr. Castle have spoken together publicly and

---

[6]  Of course, in the absence of digital music and streaming services, the music available to the public would be limited, benefiting established players like Plaintiffs here, who would face less competition for ears.

1    extensively about Lowery's litigation efforts against the music streaming services industry and the

2    issues that underlie it, written publicly and extensively about those litigation efforts and the issues

3    that underlie it, and even publicly and extensively quoted each other about those litigation efforts

4    and the issues that underlie it.  Roberts Decl. ¶ 13.

5          Given the Lowery-Castle public statements against the music streaming industry and

6    mechanical licensing, on January 4, 2017, Rhapsody served a subpoena on Mr. Castle.  Roberts

7    Decl., Ex. 23.  Mr. Castle served objections and responses and took the position—never

8    previously stated publicly, as far as Rhapsody has found—that Mr. Lowery was his client and that

9    any responsive documents are privileged.  Roberts Decl, Ex. 24.  Mr. Castle's attorney has

10   conceded there is no written retention agreement and that Mr. Lowery has never paid fees to Mr.

11   Castle.  Roberts Decl. ¶ 3.  Mr. Castle's attorney promised to provide additional information

12   regarding Mr. Castle's search for documents, but then stopped responding to Rhapsody's emails as

13   of February 7.  He has never provided a privilege log.  Roberts Decl. ¶ 3.  Rhapsody's attempts to

14   obtain similar discovery from Plaintiffs have also been stymied.  Roberts Decl. ¶¶ 4-6.

15         Plaintiffs have not been cooperative with Rhapsody's other requests related to its

16   jurisdiction motion that were served more than three months ago.  At the Case Management

17   Conference on December 16, 2016, counsel unequivocally stated they could comply timely with

18   Rhapsody's requests.[7]  The Court set the deadline for this motion based on counsel's

19   representations.[8]  Despite these representations, Plaintiffs did not produce any documents until

20   February 8, 2017.  Roberts Decl. ¶ 8.  This production consisted of over 7,000 individual pages of

21   hard copy documents.  Roberts Decl. ¶ 9.  Plaintiffs made this production incredibly burdensome

22   for Rhapsody to conduct a meaningful review because (1) despite Rhapsody's requests, Plaintiffs

23   did not produce any digital/searchable files of the documents, even though it appears they had

---

25   [7]  *See* Roberts Decl., Ex. 25 (CMC Transcript) at 10:24-11:3 ("THE COURT: Without asking
     the Plaintiffs to buy a pig in a poke here, is that going to be a problem for you providing the
26   information in a timely basis so the issue [of Rhapsody's jurisdictional motion] can be submitted
     to the Court?  MR. LEE: "I don't believe so, your honor.").

27   [8]  Roberts Decl., Ex. 25 at 12:2-4 ("Based upon Counsel's representations I'm going to set a
     deadline for the filing of [Rhapsody's jurisdictional] motion.").

28

electronic copies available; and (2) although the documents were stapled and grouped together at the inspection, Plaintiffs produced the documents as one long-running production of over 7,000 individual pages, with no indication as to where one document ends and another begins.  Roberts Decl. ¶ 9.

One week before Rhapsody's filing deadline, Plaintiffs produced 15,000 more pages of electronic documents, which were missing standard metadata and had inexplicable characters added to them which made them difficult to read and impossible to search properly.[9]  Roberts Decl. ¶ 11.  Plaintiffs then produced 7,000 more pages of electronic documents on February 14, three days before the filing deadline.  Roberts Decl. ¶ 12.

## LEGAL STANDARD

When a defendant raises a Rule 12(b)(1) challenge to the asserted basis for subject matter jurisdiction, the plaintiff bears the burden of proving subject matter jurisdiction exists.  *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990).  On a 12(b)(1) motion, the moving party may submit "affidavits or any other evidence properly before the court," and "the party opposing the motion [must] present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction."  *St. Clair v. City of Chico,* 880 F.2d 199, 201 (9th Cir. 1989) (citations omitted).

## ARGUMENT

**I.     Self-Inflicted Harm Cannot Establish Article III Standing**

Plaintiffs lack Article III standing because their alleged harm is self-inflicted.  If a plaintiff lacks Article III standing, a federal court "lacks subject matter jurisdiction over the suit."  *City of Oakland v. Lynch*, 798 F.3d 1159, 1163 (9th Cir. 2015), *cert. denied sub nom. City of Oakland, Cal. v. Lynch*, 136 S. Ct. 1486, 194 L. Ed. 2d 553 (2016) (quoting *Cetacean Cmty. v. Bush,* 386 F.3d 1169, 1174 (9th Cir. 2004)) (quotation marks omitted).  To establish Article III standing, "it is the plaintiff's burden to 'show (1) it has suffered an 'injury in fact' that is (a) concrete and

---

[9]  Due to the volume, disorganization, and late-timing of the plaintiffs' productions, Rhapsody was not able to adequately review it before filing this motion.  As with the communications of Mr. Castle, Rhapsody may need to seek leave of Court to supplement this filing.

1    particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly

2    traceable to the challenged action of the defendant; and (3) it is likely as opposed to merely

3    speculative, that the injury will be redressed by a favorable decision.'"  *In re Google, Inc. Privacy*

4    *Policy Litig.*, No. 5:12-cv-1382, 2015 WL 4317479, at *3 (N.D. Cal. July 15, 2015) (quoting

5    *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000))

6    (dismissing case for lack of standing).

7          A "self-inflicted injury" is insufficient to establish standing under Article III.  *Mendia v.*

8    *Garcia*, 768 F.3d 1009, 1013 n.1 (9th Cir. 2014) (holding detainee who voluntarily remained in

9    custody after being released lacked standing for post-release claims due to "self-inflicted injury");

10   *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir.

11   2006) ("[S]elf-inflicted harm . . . does not amount to an 'injury' cognizable under Article III.");

12   *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1155 (2013) (plaintiffs "cannot manufacture

13   standing by incurring costs in anticipation of non-imminent harm" in order to establish an injury-

14   in-fact sufficient for standing).  A plaintiff that has "within its grasp an easy means for alleviating

15   the alleged [injury]" cannot establish injury.  *Nat'l Family Planning*, 468 F.3d at 831.  Therefore,

16   if a plaintiff chooses "to remain in the lurch, it cannot demonstrate an injury sufficient to confer

17   standing."  *Id.*

18         Cases in a variety of contexts have established that a plaintiff who causes his own harm

19   lacks Article III standing.  For example, in *National Family Planning*, the plaintiff sued the federal

20   government to enjoin enforcement of a statute that prohibited plaintiff and other recipients of

21   federal grant funds from discriminating against people that refuse to provide abortions.  468 F.3d

22   at 827.  The plaintiff argued the statute was vague, in violation of the First Amendment, because it

23   conflicted with a separate regulation governing Title X funds.  *Id.* at 828.  The D.C. Circuit held

24   that the plaintiff lacked standing in part "because the association's asserted injury appears to be

25   largely of its own making."  *Id.* at 831.  The plaintiffs never attempted to petition the relevant

26   agency as to how the agency intended to enforce the statute and resolve any perceived conflict

27   between the statute and the regulation.  *Id.*  The court noted that a petition of that sort would be

28   "an easy means for alleviating the alleged uncertainty."  *Id.*  "As the association has *chosen to*

1   remain in the lurch, it cannot demonstrate an injury sufficient to confer standing." *Id.* (emphasis

2   added); *see also Mendia v. Garcia*, 768 F.3d 1009, 1013 n.1 (9th Cir. 2014) (plaintiff lacked

3   standing for post-release claims since plaintiff voluntarily chose to remain in custody following a

4   release).

5     Similarly, when a plaintiff voluntarily declines to accept money that is available to him,

6   and then complains that he has not received the money, that too is a self-inflicted harm.

7   *McConnell v. Federal Election Com'n*, 540 U.S. 93, 228 (2003) *overruled on other grounds by*

8   *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 315 (2010) (where plaintiff alleged that

9   increased limits on campaign spending harmed their ability to compete in the electoral process,

10   plaintiff lacked standing because alleged harm stemmed from plaintiff's "personal 'wish' not to

11   solicit or accept large contributions, *i.e.*, their personal choice").

12     The rule against self-inflicted harm applies to putative class actions.  When a class action

13   plaintiff knows of the harm, could have avoided it, but proceeded anyway, the plaintiff lacks

14   standing.  *Red v. Gen. Mills, Inc.*, No. 2:15-CV-02232ODWJPR, 2015 WL 9484398, at *4-5 (C.D.

15   Cal. Dec. 29, 2015).  In *General Mills*, the plaintiff purchased mashed potatoes, which allegedly

16   contained partially hydrogenated oils (PHOs), and brought a class action alleging that she "paid

17   for a safe product, but received a dangerous product," due to the PHOs.  *Id.* at *4.  The same

18   plaintiff had asserted three other lawsuits against defendants who produced foods with PHOs and

19   made several allegations regarding the health risks of PHOs.  *Id.* at *5.  The court held that these

20   previous allegations demonstrated the plaintiff knew the risks in purchasing the defendant's

21   products and concluded that "[t]his is precisely the type of self-inflicted injury that both the Ninth

22   Circuit and the District of Columbia Circuit has held does not confer standing."  *Id.*

23     Similarly, in *Swann v. Secretary, State of Georgia*, the plaintiff inmate lacked standing to

24   assert a claim against state officials regarding their failure to provide him with an absentee ballot.

25   668 F.3d 1285, 1286 (11th Cir. 2012).  The plaintiff had failed to provide the proper address on

26   the ballot application form, giving his home address instead of his address in jail.  *Id.*  The court

27   held that the "plaintiff independently caused his own injury" by providing the wrong information

28   on his ballot form.  *Id.* at 1288.

**II.     Plaintiffs' Prior Statements and Actions Demonstrate Their Harm Is Self-Inflicted**

Just as in the cited cases, Plaintiffs here had within their "grasp an easy means for alleviating" their alleged injuries.  *Nat'l Family Planning*, 468 F.3d at 831.  Although they portray themselves as the innocent victims of intellectual property theft, in reality they are sophisticated actors, motivated by personal grievances and a statutory scheme that they do not like because it imposes compulsory licensing on them at a statutory rate to which they object.  They knew how to provide, and easily could have provided—at no cost to themselves—information to HFA or Rhapsody that would have allowed them to process and pay Plaintiffs the royalties to which they believe they are entitled.  HFA and Rhapsody actively seek out and would gladly have received this identifying information, Raso Decl. ¶ 6, but for Plaintiffs' voluntary and knowing plan to obfuscate it.  Furthermore, Plaintiffs rejected royalty payments from Rhapsody, Raso Decl. ¶ 10, something other rightsholders do not do, *id.* ¶ 11; *see* Martin Decl. ¶ 5.  Because Plaintiffs had an "easy means for alleviating" their injury and have only themselves to blame for their alleged losses, they lack Article III standing and their suit should be dismissed.

As the facts set forth above so clearly show, Plaintiffs have an extensive history that shows they knew exactly what they needed to do to avoid being left "empty-handed."  In the past, they had done precisely that and had gotten paid.  But in this instance, they *made the choice* to do otherwise.  Mr. Lowery himself teaches these procedures employing a textbook that explains how to do it, points out that it costs nothing, and provides a simple less-than-one-page letter to get it done.  Plaintiffs literally could have ripped the page out of the book, filled in the blanks, put it in the mail, and received payment.  Roberts Decl., Ex. 11 at 33.  There is no reason for Plaintiffs to have failed to take the simple steps to get paid except to lay the groundwork for a lawsuit—in fact, multiple lawsuits—seeking statutory damages and attorneys' fees.  Providing their identifying information would have been "an easy means for alleviating the alleged" copyright violation.  *Nat'l Family Planning*, 468 F.3d at 831.  It is difficult to conceive of an easier means.

Mr. Lowery's public statements demonstrate Plaintiffs' true intentions: to put music streaming services out of business—or at least "cause chaos" in the industry to make a point— unless and until they can effect a change in the law, rather than to avoid any purported injury that

may have come from the alleged distribution of Plaintiffs' unlicensed works.  Like the plaintiffs in *McConnell* whose injury stemmed from "their own personal 'wish' not to solicit or accept large contributions," 540 U.S. at 228, Mr. Lowery was offered royalty payments that would have fully compensated him for all outstanding royalties owed, but he voluntarily declined to accept those payments.  Like the plaintiff in *General Mills* who "knew that she could (or should be able to) look at the ingredients on the label to determine whether or not that particular product contained PHOs," Mr. Lowery and the other named Plaintiffs knew that they could have provided basic information to HFA in order to get paid royalties by Rhapsody.  2015 WL 9484398, at *5.  And like the plaintiff in *Swann* who failed to provide the proper information on his ballot application to receive his ballot, Plaintiffs here easily could have provided the information to avoid their alleged injury.  668 F.3d at 1286.

But Plaintiffs had no interest in this "easy means" for alleviating their alleged injuries—Mr. Lowery argues that artists should be able to opt out of mechanical licensing (contrary to the law), and wants artists to wage war against the music streaming services.  Roberts Decl., Ex. 13 at 19-20; Ex. 22 at 2. Mr. Lowery's attempt to manufacture a "gotcha" technical violation of the Copyright Act is the exact type of conduct that courts seek to preclude when ruling that plaintiffs manufactured standing or engaged in self-inflicted harm upon themselves.  *Nat'l Family Planning*, 468 F.3d at 831; *Gen. Mills, Inc.*, 2015 WL 9484398, at *4-5.

### CONCLUSION

Article III is meant to ensure that the scarce and expensive resources of the Courts are reserved to redress real injuries, not to be used by parties who deliberately manipulate a situation to support their personal soapbox.  Plaintiffs could have easily avoided being "left empty-handed," but they knowingly chose to do otherwise.  Respectfully, the Court should dismiss Plaintiffs' claims for their failure to establish that this Court has subject matter jurisdiction based on a cognizable injury fairly traceable to Defendant's conduct.[10]

---

[10]   This Motion asserts only one of Rhapsody's defenses.  Should the case proceed, it intends to assert others.

DATED:  February 17, 2017

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By  _/s/ Karin Kramer_____

Karin Kramer
Thomas C. Rubin
Arthur Roberts
Patrick Burns

*Attorneys for Rhapsody International Inc.*

Case No. 4:16-CV-01135-JSW
MOTION TO DISMISS